IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHANNON MARUCCI,

    *Plaintiff*,

    v.

GREATER BALTIMORE MEDICAL
CENTER, INC.,

    *Defendant*

Civil Action No. 23-cv-0510-ABA

**MEMORANDUM OPINION**

Plaintiff Shannon Marucci ("Ms. Marucci" or "Plaintiff") worked as a nurse at Defendant Greater Baltimore Medical Center, Inc. ("GBMC" or "Defendant") prior to and during the COVID-19 pandemic. When COVID-19 vaccines became available, GBMC implemented a policy requiring employees to become vaccinated; the policy provided a process for medical or religious exemptions. Ms. Marucci sought a religious exemption under the policy, which was denied because she worked in a patient-facing role. She resigned several months later.

Ms. Marucci alleges GBMC's actions constituted religious discrimination under Title VII of the Civil Rights Act of 1964. GBMC has moved for summary judgment. ECF No. 39. For the reasons set forth below, Plaintiff has not identified evidence based upon which a reasonable jury could find in her favor. Accordingly, the Court will grant GBMC's motion for summary judgment.

## I.    BACKGROUND

At the time of the events in question, Ms. Marucci worked as a registered nurse at GBMC in an "RN Weekender" role. ECF No. 44-1 at 2.[1] She worked two 12-hour overnight shifts over the weekend, but was paid for 32 hours of work and received health benefits comparable to those of a full-time employee. *Id.,* ECF No. 39-5 at 8.  This work schedule was important to Ms. Marucci because of her child custody schedule and her class schedule for her part-time nurse practitioner degree program. ECF No. 44-2 at 37. Ms. Marucci had worked in this RN Weekender role since October 2019, ECF No. 39-7 at 2, but had previously worked at GBMC in other positions. ECF No. 39-5 at 7-8.

### A.    GBMC's vaccination policies

In June 2021, GBMC announced a requirement that all employees receive COVID-19 vaccinations by September 1, 2021, unless the employee obtained a medical or religious exemption. ECF No. 39-3 at 15-16. Following the announcement, GBMC issued a "COVID-19 Vaccination FAQ," which stated that employees who decline vaccination "will be required to participate in weekly COVID-19 testing," along with masking and physical distancing. ECF No. 39-3 at 18-19. The following month, GBMC updated the policy to delay the September 1 vaccination deadline "until one of the COVID-19 vaccines is approved by the FDA." *Id.* at 23.

In mid-August 2021, citing a spike in Maryland COVID cases and the emergence of the Delta variant, GBMC updated its vaccination policy again to require vaccination by October 1, 2021. *Id.* at 25. This iteration of the policy required weekly testing for

---

[1] Citations to page numbers refer to the number appearing in the CM/ECF header for this and the other filings referenced herein, which may not align with a document's original page numbering.

those with an approved medical or religious exemption, but no longer allowed weekly testing as an alternative to vaccination for anyone without an approved exemption. *Id.* at 26. The policy further stated that on October 1, 2021, unvaccinated employees would be placed on unpaid leave for 30 days, after which they would be terminated if they remained unvaccinated and without an approved exemption. *Id.* at 27. On September 28, GBMC announced a "slight change" to the policy, allowing employees who had received their first vaccine by October 1 to continue working, rather than requiring them to go on unpaid leave, but those employees were still required to complete the vaccine series "on schedule" and undergo weekly testing. *Id.* at 36-37.

### B.    Ms. Marucci's exemption requests

Ms. Marucci went on medical leave in early August 2021 due to a hand injury she sustained at work. ECF No. 39-8 at 2; ECF No. 47-1 at 12.[2] In September 2021, she applied for a medical exemption to the vaccine policy based on ongoing treatment for a suspected neurological condition.[3] ECF No. 39-9. She included with her application a letter from one of her medical providers that requested a deferral of the vaccination requirement based on ongoing evaluation for the undiagnosed condition and a family history of Guillain-Barre syndrome. *Id.* at 4. On September 22, 2021, GBMC's Medical Exemption Review Committee informed Ms. Marucci her request had been denied, but that she could re-apply with additional documentation within five business days. ECF No. 39-10 at 2. Ms. Marucci re-applied for a medical exemption with a new letter from

---

[2] At some point Ms. Marucci filed for worker's compensation benefits in relation to this injury, although it is not clear when she initiated this process.

[3] Earlier in the year, Ms. Marucci had experienced a suspected transient ischemic attack, sometimes referred to as a "mini stroke," but the underlying cause had not been diagnosed. ECF No. 39-9 at 4, ECF No. 44-2 at 20.

her provider; that letter did not seek a "complete exemption" but rather "an extension" of the vaccination deadline "to allow completion of ongoing diagnostics." ECF No. 39-13 at 4. On September 29, 2021, Ms. Marucci's medical exemption request was approved, granting her request for an extension of time to become vaccinated. ECF No. 39-14 at 2. The temporary exemption required her to engage in weekly COVID-19 testing, wear a mask, and complete the vaccination series by December 1, 2021. *Id.*

On September 30—the day after receiving this approval, and the day before the deadline to submit exemption application requests—Ms. Marucci applied for a religious exemption from the vaccination policy. ECF No. 39-15. She included two letters in support: a letter from a Reverend Father stating that the Catholic Church's teachings "may lead certain Catholics . . . to decline certain vaccines," and a letter from Ms. Marucci stating that the vaccines violate her "sincere, deeply held, personal religious belief" as a baptized Catholic. ECF No. 39-15 at 4-5. On October 5, GBMC denied the exemption request. ECF No. 39-16 at 2. The denial letter stated:

> [W]e have determined that granting your request imposes an undue hardship on GBMC HealthCare. More specifically, your position at GBMC HealthCare involves direct patient care of vulnerable patients. Based upon current scientific research and recommendation, we have determined that, with effective vaccines available, unvaccinated individuals providing direct patient care may pose a direct threat to the health and safety of vulnerable patients, and thereby religious exemptions for those employees constitute an undue hardship.

*Id.* The letter noted that "[a]s a reasonable accommodation," GBMC would "consider [Ms. Marucci] for any vacant non-direct patient care positions for which [she] qualif[ies]." *Id.* It also warned that failure to comply with the policy "will result in corrective action up to and including termination." *Id.*

### C.     Plaintiff's separation from employment

Over the next several weeks, Ms. Marucci and GBMC staff communicated via email, letter, and phone about her ongoing desire for a religious exemption. *See* ECF No. 39-5 at 18, ECF Nos. 39-17, 39-18, 39-19, 39-20. Ms. Marucci reiterated her request for a religious exemption in an October 12 email, writing, "I'm being discriminated against because of my religious beliefs and threatened with loss of employment if I do not follow the vaccine mandate to take this vaccine." ECF No. 39-17 at 2. She added, "I am willing to be tested weekly as a reasonable accommodation to the religious exemption as is the practice in other local hospitals." *Id.*

Ms. Marucci emailed GBMC Vice President of Human Resources Anna-Maria Palmer on October 19.[4] ECF No. 39-18. Her email read, in part:

> It was stated that you are offering a "reasonable" accommodation by allowing me to apply for a non-patient contact position. After looking through the numerous job postings listed, there is not one that I can apply for as a nurse that not only allows me to use my skill set, but *gives me the same schedule and benefits that I am now receiving* . . . A reasonable accommodation would be allowing me to keep my job with weekly testing and the continuation of wearing an N95 and any other necessary PPE.

*Id.* at 2 (emphasis added).

---

[4] This email began, "I am in receipt of your most recent letter addressing my concerns regarding my religious exemption and GBMC's religious discrimination towards me, as well as the absence of an EEOC officer at GBMC." ECF No. 39-18 at 2. This comment suggests that there was a letter from GBMC to Ms. Marucci addressing the topics mentioned that was sent between October 12 and October 19, but that letter does not appear to be part of the summary judgment record. *See* ECF No. 39-1 at 21 (indicating written communications from GBMC on October 27 and November 8).

On October 27, GBMC's Vice President and Chief Human Resources Officer replied to Ms. Marucci by email, stating that GBMC had "carefully considered your request for a religious exemption" and reiterating that a religious exemption for patient-facing roles constitutes an undue hardship. ECF No. 39-19 at 2-3. The email further stated, "We understand you have reviewed open positions on the GBMC website, but we remain willing to further investigate open positions with you personally in order to continue the dialogue about a reasonable accommodation." *Id.* at 2.

Ms. Marucci replied by email on November 5 requesting contact information for GBMC's EEOC officer and noting that she had communicated with her attorney about this issue. *Id.*

On November 8, 2021, Ms. Palmer replied to Ms. Marucci, as follows:

> We have received your letter of complaint to the Human Resources Department about the vaccine mandate.
>
> We are not analyzing the sincerity of your religious belief that you cannot be vaccinated, as we have determined that with effective vaccines available, unvaccinated individuals providing direct patient care may pose a direct threat to the health and safety of vulnerable patients, and thereby religious exemptions for those employees constitute an undue hardship.
>
> The Human Resources Department does not have an assigned EEOC officer so cannot make a complaint to that agency for you. As we have previously stated, GBMC is offering you a reasonable accommodation, which is to consider you for any vacant non-direct patient care positions for which you qualify, and for which an exemption to the mandatory vaccination policy would not create an undue hardship. If you are interested in exploring such positions as an accommodation, please contact Kia Hinton, HR Business Partner Manager, at [contact information].

ECF No. 39-20 at 2.

6

Although the exact timeline is unclear, sometime between the initial denial of her religious exemption request and December 2021, Ms. Marucci searched for positions in different units that did not require direct patient care. ECF No. 39-21 at 6. She believed that she "wasn't limited to just nursing" because she had a degree in another field (psychology). ECF No. 39-5 at 17. She found two positions that she believed were non-patient facing, but was told that both positions were patient-facing. ECF No. 39-5 at 26. The first was a clinical role in Employee Health where GBMC employees were the patients. ECF No. 44-2 at 35-36. The second was a role in a "monitor room" in the hospital's intensive care unit (ICU); Ms. Marucci contends she was "not allowed to apply" for this position because it was located on a clinical floor, and she would need to walk through the ICU to access it. ECF No. 44-2 at 36. Ms. Marucci did not apply for either position. ECF No. 39-4 at 4, ¶ 15. Although she does not identify specific roles other than these two positions, she states generally that she "tried for months to find a position," but, she says, "every position I asked about, I was denied" and "every position I inquired about had something to do with patients or was on a floor that had direct patient care." ECF No. 39-21 at 6, 8. She also states that an HR representative at GBMC told her there were no jobs that matched her current position and salary. ECF No. 39-21 at 6. Ms. Marucci states that she "exhausted all avenues to continue [her] employment at GBMC in a non-direct patient care position" *Id.* at 7.

On November 22, 2021, Ms. Marucci was cleared to return to full duty without restrictions at work, although she was reluctant to return because she was still seeing a physical therapist and a doctor who did not think full mobility in her hand had

returned.[5] ECF No. 39-5 at 13-14. She emailed colleagues to inform them that she could be put back on the schedule for the weekend of November 26-28, but told them she "still ha[d] a sprain in [her] wrist" and "d[id] not have the availability [sic] to fully grasp and put pressure on my hand." ECF No. 44-2 at 32. No one responded, and she did not work that weekend. ECF No. 39-5 at 13, 14.

On December 1, 2021—the deadline by which she was required to be vaccinated based on her medical exemption—Ms. Marucci was placed on an unpaid leave of absence while she and GBMC continued to resolve her worker's compensation case. ECF No. 44-2 at 32.[6]  During this unpaid leave period, GBMC continued to provide medical benefits to Ms. Marucci. *Id.*, ECF No. 39-4 at 5. In March 2022, Ms. Marucci settled her worker's compensation dispute with GBMC and resigned from her position. ECF No. 44-3.

### D.    Procedural history

Ms. Marucci filed the operative complaint in April 2023, alleging two counts of religious discrimination, under both a disparate treatment and failure-to-accommodate theory. ECF No. 11.[7] GBMC answered the complaint, ECF No. 14, and in April 2024 filed a motion for summary judgment, along with its accompanying exhibits, ECF Nos. 39,

---

[5] After her wrist injury but before she was cleared to return in November, GBMC offered Ms. Marucci a "handful" of shifts in a light-duty position, but she did not accept them because most of the shifts were day shift, which did not work with her school schedule. ECF No. 44-2 at 31.

[6] Ms. Marucci had not sought an additional extension of her medical exemption between the date that it was originally granted and the December 1, 2021 vaccination deadline. ECF No. 39-4 at 3.

[7] The complaint also included a third count for disability discrimination under the Americans with Disabilities Act, but the parties stipulated to the dismissal of that count without prejudice. *See* ECF No. 30.

39-1 through 39-22. Ms. Marucci opposed the motion with her own exhibits, ECF Nos. 44, 44-1 through 44-13, and GBMC filed a reply brief, ECF Nos. 47, 47-1.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because GBMC has moved for summary judgment, the Court must view the evidence in the light most favorable to Ms. Marucci, *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014), and draw all reasonable inferences in her favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination "because of . . . religion." 42 U.S.C. § 2000e–2(a)(1). "Courts have recognized that employees may utilize two theories in asserting religious discrimination claims." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996) (citing *Mann v. Frank*, 7 F.3d 1365, 1368-70 (8th Cir. 1993)). "These theories are denominated as the 'disparate treatment' and 'failure to accommodate' theories." *Id.*; *see also Wright v. Olin Corp.*, 697 F.2d 1172, 1184 (4th Cir. 1982) ("[I]t is often appropriate to assess particular Title VII claims and defenses alternatively under different theories."). Plaintiff's complaint asserts claims under each theory: Count 1 for "Disparate Treatment – Religion," and Count 2 for "Refusal to Provide Reasonable Accommodation." ECF No. 11 at 7, 9.

In her response to GBMC's motion, Ms. Marucci only defends against summary judgment on her accommodation claim (count 2). *See* ECF No. 44 at 14 (main argument point heading: "Genuine issues of material fact preclude summary judgment in GBMC's favor on Ms. Marucci's *failure to accommodate claim*.") (emphasis added). So arguably she has forfeited any arguments as to disparate treatment. But for completeness, and because some aspects of her argument seem to invoke disparate treatment standards, *see, e.g.*, *id.* at 12 (contending that in applying its vaccine policy, GBMC engaged in "Discriminatory Treatment of Employees with Sincerely Held Religious Beliefs"), the Court will address her claims under both theories. For the following reasons, GBMC is entitled to summary judgment on both theories/counts.

### A.     Plaintiff's failure-to-accommodate claim

As noted above, Title VII, among other things, prohibits employment discrimination based on religion. Section 2000e(j) "illuminate[s] the meaning of religious discrimination under the statute." *Ansonia Bd. Of Educ. v. Philbrook*, 479 U.S. 60, 63 n.1 (1986). It defines "religion" as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate [the] observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). A religious "failure to accommodate" claim is based in this requirement under the statute.

In religious accommodation cases, courts apply a burden-shifting framework "akin to the one articulated by the Supreme Court in *McDonnell Douglas*." *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)). Under this framework, the plaintiff must first make out the elements of a *prima facie* case, which requires Ms. Marucci to prove that

(1) she "has a bona fide religious belief that conflict[ed] with an employment requirement," (2) she "informed the employer of this belief," and (3) she "was disciplined for failure to comply with the conflicting employment requirement." *Id.* (quoting *Chalmers*, 101 F.3d at 1019). Once an employee makes out a *prima facie* case, the burden shifts to the employer to show that it could not reasonably accommodate the religious need without undue hardship. *Id.* To satisfy this burden, the employer must show either that it provided the employee with a reasonable accommodation or that it did not provide an accommodation because doing so would have caused an "undue hardship." *Firestone Fibers*, 515 F.3d at 312 (quoting *Chalmers*, 101 F.3d at 1019). Although the questions of reasonable accommodation and undue hardship are "separate and distinct," they are still "interrelated." *Id.* at 314. "For instance, an accommodation that results in undue hardship almost certainly would not be viewed as one that would be reasonable." *Id.*

GBMC argues that the failure-to-accommodate claim fails because (1) Ms. Marucci has failed to establish a *prima facie* case, (2) it offered a reasonable accommodation, and (3) it could not grant Plaintiff's requested accommodation (*i.e.*, remaining unvaccinated but masking and undergoing weekly testing) because that proposed accommodation would pose an undue hardship.[8] ECF No. 39-1 at 9. GBMC maintains that Plaintiff's request to work directly with patients while unvaccinated, during the height of the pandemic, was not reasonable due to the risks of COVID-19

---

[8] GBMC also argues that both of Plaintiff's claims are barred by statute because Title VII protects employers who rely on an EEOC "written interpretation or opinion" from liability. ECF No. 39-1 at 40-41. Because GBMC is entitled to summary judgment on Plaintiff's failure-to-accommodate claim on other grounds, the Court does not reach that issue.

transmission. *Id.* at 33-34. GBMC also states that Ms. Marucci chose not to accept the reasonable accommodation it offered (*i.e.*, transitioning to a non-patient-facing position) because of her childcare and school schedule. *Id.* at 9.

Plaintiff maintains there is a genuine issue of material fact about whether GBMC could accommodate her religious belief without undue hardship.[9] ECF No. 44 at 16-21. Specifically, Ms. Marucci argues that GBMC has not shown that an undue hardship would have resulted from her requested accommodation because other hospitals granted her that accommodation. *Id.* at 19.

Ms. Marucci's failure-to-accommodate claim fails because the undisputed evidence establishes that GBMC could not have accommodated Ms. Marucci's vaccination exemption without undue hardship. "An employer who shows that it cannot accommodate an employee's religious needs without suffering undue hardship is not liable under Title VII." *EEOC v. Bridgestone/Firestone, Inc.*, 95 F. Supp. 2d 913, 921 (C.D. Ill. 2000) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). A "hardship" is "undue" where it is "'excessive' or 'unjustifiable'" in the overall context of an employer's business after considering all relevant factors, including an accommodation's practical impact given the nature, size, and operating cost of the business. *Groff v. DeJoy*, 600 U.S. 447, 469-71 (2023). Effects on co-workers can be part of the hardship analysis when they affect the "conduct of the employer's business."

---

[9] Ms. Marucci also objects that GBMC did not "engage in an interactive process" with her regarding her accommodations. ECF No. 44 at 16-17. But religious accommodations do not necessarily involve an interactive process in the way that disability accommodations often do. *See Ansonia*, 479 U.S. at 69 ("[A]n employer has met its obligation under [Title VII] when it demonstrates that it has offered a reasonable accommodation to the employee.").

*Id.* at 472. A court must consider this question in a "common-sense manner." *Id.* at 471.

Hardship in this context is also not limited to economic effects. *EEOC v. Greyhound Lines, Inc.*, 554 F. Supp. 3d 739, 752 (D. Md. 2021) (explaining that non-economic costs might include, for example, "damage to employee morale, compromise of a collective bargaining agreement or seniority system, or unequal treatment of other employees").

Ms. Marucci contends that a reasonable accommodation did exist, namely, "continued compulsory masking and weekly COVID-19 testing," and that GBMC wrongly rejected this accommodation. ECF No. 44 at 17. GBMC argues that this requested accommodation was not reasonable due to the risk of virus transmission. ECF No. 39-1 at 33. Considering GBMC's circumstances in a "common-sense manner" in the "overall context" of GBMC's work, *Groff*, 600 U.S. at 468, 471, the undisputed evidence establishes that Ms. Marucci's requested accommodation presented an undue hardship to GBMC based on its significant interests in avoiding transmission of COVID-19 among employees and patients.

GBMC's expert report indicates that as of mid-2021, there was "initial evidence of reduced secondary transmission from vaccinated people to their close contacts." ECF No. 39-2 at 5. In addition, the evidence at the time suggested that vaccinated individuals had a lower viral load compared to unvaccinated individuals. *Id.* "[T]he consensus among infectious disease experts was that vaccines were the best (safest, most effective, and most scalable) protection for patients and those providing care to them." *Id.* In other words, it is undisputed that GBMC relied on valid, scientific sources to support its decision to require vaccination among those who were engaged in direct in-person patient care. Granting Ms. Marucci's requested accommodation would have, in essence,

permitted her to employ prevention measures that were less effective than another available method (namely, vaccination).

The undisputed evidence also establishes that GBMC had valid reasons to attempt to reduce transmission of COVID-19 among patients and staff. As GBMC notes, health care professionals "have an ethical and professional duty to protect those they encounter professionally." ECF No. 39-3 at 4. And the need to limit COVID-19 transmission was even more acute during the height of the pandemic. At the time GBMC imposed its vaccine mandate, approximately 700,000 Americans had died from COVID-19. ECF No. 47 at 7 n.1, citing *COVID-19 U.S. Deaths*, World Health Organization, https://data.who.int/dashboards/covid19/deaths?m49=840&n=0 ["WHO COVID-19 Deaths report"].[10] In September 2021, the United States averaged more than one million cases per week and, in October 2021, more than 10,000 Americans on average were dying each week from the disease. *Id.* at 7, nn. 3, 4 (citing *COVID-19 U.S. Cases*, World Health Organization, https://data.who.int/dashboards/covid19/cases?m49=840&n=0 ["WHO COVID-19 Cases report"] and WHO COVID-19 Deaths report). The undisputed evidence establishes that the risks of COVID-19 transmission to Defendant's business were great enough that asking GBMC's staff and patients to take on more risk than GBMC deemed necessary based on the available scientific evidence posed an undue hardship.

---

[10] Although Defendant's reply brief states that number of deaths was "nearly 900,000" at the time of the vaccine mandate, data from Defendant's cited source show there were 702,577 cumulative deaths as of October 3, 2021. *See Weekly COVID-19 Cases and Deaths by Date Reported to WHO*, World Health Organization, https://data.who.int/dashboards/covid19/data?m49=840&n=0.

First, the use of less effective prevention measures would have required GBMC to accept an increased risk that COVID-19 would be transmitted to other GBMC employees. The spread of illness among staff undoubtedly would have made it more challenging for GBMC to meet its staffing needs. Employees who contracted the virus would be unable to work while out sick. At certain points in the pandemic, hospitals "strained to maintain adequate staffing to provide both emergency and routine care for their patients." ECF No. 39-2 at 4.  GBMC in particular had experienced 18 months of staffing shortages while "caring for a maximum capacity patient load" during the pandemic. ECF No. 47 at 7-8. All that evidence is undisputed. In light of high hospitalization rates and periods of under-staffing at the time, ECF No. 39-3 at 6, ¶ 32, GBMC had a strong interest in preventing its employees from contracting COVID.[11] *See Groff*, 600 U.S. at 472 (holding that "coworker impacts that go on to affect the conduct of the business" are relevant to the analysis) (cleaned up). It would have been an undue hardship to allow some employees to use less effective prevention measures at the risk of not only the health of GBMC's staff, but also GBMC's ability to appropriately staff its units.

Second, the undisputed evidence establishes that GBMC relied upon evidence that the use of less effective prevention measures increased the risk that COVID-19

---

[11] In fact, while masking provided some protection against transmission in the hospital setting, vaccination provided protection in all of an employee's activities, including those outside the hospital setting. *See* ECF No. 48-3 at 6 (noting a contemporaneous study concluding that COVID-19 vaccination reduced household transmission) (citing Ross J. Harris, et al., *Effect of Vaccination on Household Transmission of SARS-CoV-2 in England*, New England Journal of Medicine (2021). The requirement, therefore, reduced the risk of transmission overall, not just transmission that took place in the hospital.

would be transmitted to GBMC patients. Indeed, GBMC's daily work of serving vulnerable patients is central to a "common sense" analysis here. Many hospital patients are, by definition, unwell and may have compromised immune systems, whether acutely or chronically. It is, likewise, common sense that GBMC has an interest in avoiding additional health complications among its patients. Therefore, it was reasonable for GBMC to insist upon strong measures to prevent potential COVID-19 transmission to patients. Ms. Marucci's contention that only a few patients contracted COVID while hospitalized, ECF No. 44 at 21, does not create a genuine dispute as to whether strong prevention measures were necessary. If anything, the fact that four or five patients *did* acquire COVID-19 while hospitalized underlines that the risks GBMC sought to mitigate were not merely hypothetical. *See* ECF No. 44-13 at 3.

Other courts confronting similar situations have reached the same conclusion regarding undue hardship. *See, e.g.*, *Kizer v. St. Jude Child.'s Rsch. Hosp., Inc.*, No. 2:22-cv-02620-TLP-cgc, 2024 WL 4834056 (W.D. Tenn. Feb. 9, 2024) ("allowing Plaintiff to come to work unvaccinated while continuing the COMPASS Protocol [masking, testing, and physical distancing requirements] would have been a substantial burden for St. Jude" constituting an undue hardship due to health and safety concerns and potential legal liability); *Together Emps. v. Mass. Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 435-36, 441 (D. Mass. 2021) (determining on a motion for a preliminary injunction that hospital had a reasonable likelihood of success in showing undue hardship due, in part, to the need to minimize staff absences, the fact that the hospital is in the business of caring for medically vulnerable people, and the inadequacies of testing relative to vaccination); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, Case No. 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022) (granting summary judgment for hospital in

part because exempting nurse from flu vaccine requirement and allowing her to wear a mask for religious reasons would pose an undue hardship, given the risk of transmission to patients).

For these reasons, there is no genuine dispute of material fact that GBMC could not have accommodated Ms. Marucci's vaccination exemption without undue hardship. Accordingly, GBMC is entitled to summary judgment on Plaintiff's accommodation claim.[12]

### B.    Plaintiff's disparate-treatment claim

To establish a *prima facie* case of disparate treatment, an employee must show (1) membership in a protected class, (2) satisfactory job performance, (3) an adverse employment action, and (4) different treatment from similarly situated employees outside the protected class. *See Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024). When a plaintiff (as here) presents only indirect evidence of disparate treatment, courts generally apply the *McDonnell Douglas* burden-shifting framework. *See Medlock v. Rumsfeld*, 336 F. Supp. 2d 452, 464 (2002) (citing *McDonnell Douglas*, 411 U.S. at 802). If a plaintiff makes out a *prima facie* case of discrimination, the burden of production shifts to the defendant to rebut the presumption that the employment action was based on intentional discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255-56 (1981). To do so,

---

[12] Having concluded that GBMC is entitled to summary judgment on this ground, the Court need not and does not decide (1) whether Ms. Marucci "was disciplined" for purposes of step 3 of the *prima facie* case, (2) whether the accommodation GBMC offered to her constituted a reasonable accommodation sufficient to additionally entitle it to summary judgment, *see* ECF No. 39-1 at 36-40, or (3) whether Plaintiff's accommodation claim is barred by statute based on an employer's reliance on an EEOC "written interpretation or opinion." *Id.* at 40-41.

the defendant must produce admissible evidence that, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis omitted) (citing *Burdine,* 450 U.S. at 254-55 & n.8). If the defendant produces such evidence, then the plaintiff must show "that the proffered reason was not the true reason for the employment decision." *Id*. at 507 (quoting *Burdine*, 450 U.S. at 256). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. (quoting *Burdine*, 450 U.S. at 253).

GBMC argues Plaintiff's disparate treatment claim fails as a matter of law for three reasons: (1) she did not suffer an adverse employment action because she voluntarily resigned, and was not constructively discharged, ECF No. 39-1 at 24-25; (2) she has not shown that she was treated differently from similarly situated employees outside her protected class, *id*. at 25-26; and (3) regardless, GBMC had a legitimate, non-discriminatory reason for its implementation of the vaccine mandate and there is no evidence that its employment actions were pretextual. *Id*. at 27-28. The Court holds that, for the first and third reasons, GBMC is entitled to summary judgment on the disparate treatment claim; the Court need not and does not reach the question of whether Ms. Marucci was treated differently than any "similarly situated" employees.

### 1.    *No cognizable adverse employment action*

GBMC contends Ms. Marucci has not shown that she suffered an adverse employment action because she voluntarily resigned from her position. ECF No. 39-1 at 24-25. Ms. Marucci contends she has satisfied the "adverse employment action" element of her disparate treatment claim because the circumstances of her employment were so

intolerable that her decision to resign constituted a constructive discharge, and thus, an adverse employment action. ECF No. 44 at 21-22.[13]

Constructive discharge is one type of adverse employment action that can support a *prima facie* case. *See Ofoche v. Apogee Med. Grp., Va., P.C.*, 815 F. App'x 690, 692 (2020) (analyzing constructive discharge as an adverse employment action within the context of a disparate treatment claim); *see also Dones v. Donahoe*, 987 F. Supp. 2d 659, 668 (2013) ("[C]onstructive discharge is a form of an adverse employment action.").[14] But here, Ms. Marucci has failed to establish a *prima facie* case of disparate treatment because the undisputed evidence establishes that her resignation does not constitute constructive termination.

Constructive discharge takes place when "an employer creates intolerable working conditions . . . [that] force the employee to resign."[15] *Carter v. Ball*, 33 F.3d

---

[13] GBMC interprets Plaintiff's constructive discharge argument as a new, independent cause of action, and argues that she is precluded from essentially amending her complaint in response to a summary judgment motion. ECF No. 47 at 9. The Court does not interpret the constructive discharge argument in Ms. Marucci's reply brief as an attempt to assert an independent cause of action for constructive discharge, but rather as support for the adverse employment action element necessary to establish a *prima facie* case.

[14] It appears the Fourth Circuit does not distinguish between the elements for constructive discharge as an independent claim and constructive discharge as an adverse employment action. *See Ofoche*, 815 F. App'x at 692 (citing several cases that address constructive discharge as an independent claim and applying that case law to the case involving constructive discharge as an adverse employment action within the context of a disparate treatment claim, and citing, *e.g.*, *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1133 (4th Cir. 1995) (constructive discharge claim), and *Green v. Brennan*, 578 U.S. 547, 555 (2016) (constructive discharge claim)).

[15] In the past, constructive discharge also required deliberateness by the employer. *See Carter*, 33 F.3d at 459 ("A constructive discharge occurs when an employer creates

450, 459 (4th Cir. 1994). The standard for "intolerability" is "more stringent than the 'severe and pervasive' standard for hostile work environment claims." *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 162 (4th Cir. 2018). A demotion that "is essentially a career-ending action or a harbinger of dismissal," can qualify as constructive discharge. *Carter*, 33 F.3d at 459. Less drastic job changes generally do not. *See id.* ("'[A] slight decrease in pay coupled with some loss of supervisory responsibilities' is insufficient evidence of constructive discharge.") (quoting *Jurgens v. EEOC*, 903 F.2d 386, 391-92 (5th Cir. 1990)) (alteration in original). The constructive discharge inquiry is objective. *Nnadozie*, 730 F. App'x at 162. That is, it does not ask whether *that* employee subjectively felt the employee needed to resign, but whether a "reasonable person in the employee's position would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004); *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211-12 (4th Cir. 2019) (explaining that the mere showing that a reasonable person "would have viewed resignation as the wisest or best decision" is not intolerability). "[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Id.* at 147 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)) (alteration in original).

---

intolerable working conditions in a deliberate effort to force the employee to resign.") Deliberateness, however, is no longer required. *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (explaining that "the Supreme Court revisited the standard for constructive discharge in [*Green*], and expressly rejected a 'deliberateness' or intent requirement," so whether the employer acted deliberately to force the employee to quit "is no longer relevant") (citing *Green*, 578 U.S. at 560).

The undisputed evidence establishes that, at the time of her resignation, Ms. Marucci was not yet in a position where she had "*no choice* but to resign." *Perkins*, 936 F.3d at 212 (quoting another case). Indeed, Ms. Marucci had options available to attempt to find a solution that would avoid having to "choos[e] between [her] sincerely held religious beliefs and rejecting those beliefs" to remain employed. ECF No. 44 at 22. First, she could have sought an extension of her medical exemption. Ms. Marucci was cleared to work in late November while unvaccinated because her medical exemption was still effective until December 1, 2021. ECF No. 39-5 at 13-14. She did not, however, seek an additional extension of this deadline, even though she believed as early as late September that she would not be able to complete the neurological testing by that date. ECF No. 39-5 at 22. Ms. Marucci stated in her deposition that she did not talk to her HR representative about the December 1 date. ECF No. 39-5 at 19.

Second, Ms. Marucci could have continued to engage with GBMC between January 2022 and her eventual resignation in March 2022 about available positions. Notwithstanding her statements that she had "exhausted all avenues" to remain employed at GBMC, ECF No. 39-21 at 7, Ms. Marucci testified that she did not talk to her HR representative after December 2021 about getting another position at GBMC because she "assumed . . . she was no longer employed." ECF No. 39-5 at 18-19. She did not reach out to HR to clarify her employment status after December 1, *id.* at 19, and acknowledged that she was still employed at the time of her resignation in March 2022. ECF No. 39-5 at 19 ("Q[:] So fair to say, you were still employed as of the time of you signing this in March – A[:] Yes.").

The undisputed evidence establishes that Ms. Marucci's resignation did not constitute a constructive discharge based on intolerable conditions that objectively left

her with no choice but to resign. Therefore, as to Ms. Marucci's disparate treatment claim, summary judgment in GBMC's favor is proper.

### 2.    The vaccine mandate was legitimate and not pretextual.

Ms. Marucci's disparate impact claim also fails for the additional reasons that, based on the undisputed evidence, GBMC had a legitimate, non-discriminatory reason for its vaccination policy, and for requiring Ms. Marucci to comply with it, and there is no evidence that a reasonable jury could rely upon to find that this reason was pretextual. Because Ms. Marucci has "fail[ed] to make a showing sufficient to establish the existence of" pretext, GBMC is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Here, the undisputed evidence establishes that GBMC had a legitimate, non-discriminatory reason for its requirement, during the height of the pandemic, that employees who were in direct care positions, and were medically eligible for vaccination, be vaccinated against COVID-19 in order to "protect the health and safety of GBMC's vulnerable patients and staff," ECF No. 39-1 at 27, and for applying it to Ms. Marucci.[16] And although Defendant's burden is merely "one of production, not persuasion," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000), Section III. A above details GBMC's numerous justifications for its vaccination policy, which was grounded

---

[16] As noted above, the undisputed evidence establishes that GBMC did not take any adverse employment action with respect to Ms. Marucci; she resigned, and was not constructively discharged. *See* § III.B.1, *supra*. But even if Ms. Marucci had been constructively discharged (for example), for the reasons explained in this section the undisputed evidence establishes that GBMC had a legitimate non-discriminatory basis for any employment actions it took *pursuant to* its vaccination policy.

in the science available at the time of its implementation. That undisputed evidence amply satisfies GBMC's burden of production under the *McDonnell Douglas* framework.

That means the burden shifts back to Plaintiff. *Burdine*, 450 U.S. at 256. To avoid summary judgment, Ms. Marucci would have to be able to point to admissible evidence in the record from which a reasonable jury could find that GBMC's valid, non-discriminatory reasons for requiring vaccination were, in fact, a pretext for religious discrimination. *See Hicks*, 509 U.S. at 507-08. A showing of pretext is an important step in allowing the factfinder to reason that the motive for the employment action was *not* what the employer contends, but rather, was impermissible discrimination. *See id.* at 515 (reasoning that a plaintiff cannot prove that a reason is "'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."). Title VII plaintiffs like Ms. Marucci retain the burden of persuasion to ultimately show that the defendant intentionally discriminated against them. *See Hicks*, 509 U.S. at 511; *see also Burdine*, 450 U.S. at 256 ("This burden [of demonstrating pretext] now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.").

"[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) (citation omitted). A plaintiff may also attempt to "amass[] circumstantial evidence that . . . undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006). But the mere offer of some evidence to challenge the alleged non-discriminatory reason is not necessarily enough to preclude summary judgment in the employer's favor; the offered evidence

must be *sufficient* for the factfinder to find that the employer's justification is false. *Reeves*, 530 U.S. at 148. And even then, "there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* On a motion for summary judgment, the court must evaluate "'the probative value of the proof that the employer's explanation is false.'" *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 215 (4th Cir. 2007) (quoting *Reeves*, 530 U.S. at 149).

Here, Ms. Marucci does not explicitly address the issue of "pretext" in either her amended complaint or her reply to the motion for summary judgment. But she does offer several reasons why she believes GBMC's refusal to allow her requested accommodation is suspect. Specifically, she notes that (1) her requested accommodation of masking and weekly testing had been acceptable at GBMC in the past, (2) other local hospitals allowed her to work with her requested accommodation, (3) only a few patients contracted COVID-19 while hospitalized at GBMC, and (4) GBMC no longer has a vaccine mandate. ECF No. 44 at 6, 19, ECF No. 44-13 at 3. Drawing all reasonable inferences in her favor, *Scott*, 550 U.S. at 378, the Court interprets these arguments as allegations that GBMC's reasons for were pretextual.

Even under this interpretation, Ms. Marucci's evidence comes nowhere close to sufficient for a reasonable factfinder to conclude that GBMC's reasons for its actions were pretextual—*i.e.*, that GBMC's vaccine mandate (or its application to her) was not about protecting patients and staff but rather was a veiled and intentional attempt to discriminate on the basis of religion. Nor does this evidence establish that GBMC's "proffered explanation is unworthy of credence." *See Burdine*, 450 U.S. at 256. The Court will address each of Ms. Marucci's contentions in turn.

Ms. Marucci's first argument is that GBMC's past use of masks and weekly COVID-19 testing as prevention measures is an inconsistency that supports pretext. ECF No. 44 at 13. While a plaintiff may point to inconsistency as evidence supporting pretext, inconsistencies are not always probative of pretext. *See, e.g., Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000) (stating that evidence of inconsistent explanations in how a company selected salespeople for termination was "simply not probative of pretext" because only one person made the firing decisions, and a different employee's statement about what factors they believed that person considered were not relevant to what actually motivated the decision making). Here, the record establishes multiple non-discriminatory reasons for this inconsistency. First, for much of the time that GBMC relied on masking and/or testing for prevention, vaccines were not yet available. *See* ECF No. 39-3 at 5, ¶ 24; ECF No. 44 at 9; ECF No. 44-2 at 39. Second, at the time GBMC introduced its vaccine mandate, there was new evidence about how COVID-19 is transmitted and the efficacy of vaccines in preventing transmission and infection. ECF No. 39-2 at 7 (citing evidence from the CDC in May 2021 that "mRNA vaccines from Pfizer-BioNTech and Moderna reduced risk of SARS-CoV-2 infection by 94%"). GBMC relied on scientific evidence available at the time to inform its vaccination policy. ECF No. 39-3 at 5, ¶¶ 26, 27. Finally, the vaccine mandate was imposed at a time when the numbers of infections and deaths were rapidly rising. ECF No. 47 at 7 (citing WHO COVID-19 Deaths report and WHO COVID-19 Cases report).

Ms. Marucci's evidence that other hospitals permitted her to work with her requested accommodations likewise does not suggest that GBMC's stated reasons for its enforcement of the vaccine mandate were pretextual. Ms. Marucci's employment conditions at other hospitals are evidence *that* GBMC acted differently from other

hospitals, but it is not probative as to *why* GBMC acted differently. In other words, even if other hospitals reached different conclusions in the face of the same scientific evidence, that does not come close to suggesting that GBMC's "asserted justification" for its policy was "false." *See Reeves*, 530 U.S. at 148.

Ms. Marucci's remaining evidence challenging GBMC's articulated reasons for its enforcement of the vaccination policy is also unavailing. Even if only a few patients contracted COVID-19 while hospitalized at GBMC, that fact is not probative of whether GBMC's offered reasons were pretextual. Similarly, Ms. Marucci's contention that GBMC no longer requires COVID vaccination does nothing to suggest that GBMC was acting pretextually in requiring vaccination in late 2021 to reduce COVID-19 transmission based on health and safety concerns.[17] If anything, the fact that, since April 2023, GBMC has rehired several nurses who were fired for non-compliance with the policy, and have since granted them religious exemptions, *see* ECF No. 44-13 at 6, further supports GBMC's contention that the policy was about safety and disease transmission—not about any employee's religious beliefs.

In light of these considerations, and the absence of any other evidence that GBMC's actions were based on religious discrimination, Ms. Marucci has not set forth

---

[17] The current status of GBMC's COVID-19 vaccine mandate is disputed. Ms. Marucci stated in her opposition brief in May 2024 that "GBMC no longer has a COVID-19 vaccine mandate." ECF No. 44 at 6. GBMC has denied that it had no COVID-19 vaccination requirement for employees as of, presumably, early 2024. *See* ECF No. 44-13 at 3. Dr. John Flowers, GBMC's Chief Medical Officer, stated in an April 2024 affidavit that "[o]n April 17, 2023 . . . GBMC again updated its vaccine policy to consider and approve religious exemptions to its COVID-19 vaccine requirements for direct care providers, consistent with GBMC's flu vaccine requirement." ECF No. 39-3 at 10. But for the reasons discussed above, insofar as there is a dispute in the record about GBMC's current COVID vaccination policy, any such dispute is immaterial.

sufficient evidence to show that GBMC's alleged reasons for its employment actions are false. See *Reeves*, 530 U.S. at 148. GBMC is, therefore, entitled to summary judgment on Plaintiff's disparate treatment claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendant GBMC's motion for summary judgment, ECF No. 39. An appropriate order follows.


Date:  March 18, 2025                              _____/s/_____
                                                              Adam B. Abelson
                                                              United States District Judge